**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**ALEXANDER E. JONES,**<br><br>**Debtor.** | §<br>§<br>§<br>§<br>§<br>§ | **Chapter 7**<br><br>**Case No. 22-33553 (CML)** |
| **CHRISTOPHER R. MURRAY, CHAPTER 7 TRUSTEE,**<br><br>**Plaintiff,**<br>**v.**<br><br>**ERIKA WULFF JONES; DAVID R. JONES, INDVIDUALLY; AND DAVID R. JONES, AS TRUSTEE OF THE ALEXANDER E. JONES DESCENDANT AND BENEFICIARY TRUST.**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Pro. No. ____________** |

**TRUSTEE'S COMPLAINT**
**TO AVOID AND RECOVER TRANSFERS TO INSIDERS PURSUANT TO 11 U.S.C. § 544, 11 U.S.C. § 547, 11 U.S.C. § 548, 11 U.S.C. § 550 AND TEX. BUS. & COM. CODE § 24.001 ET. SEQ.**

Christopher R. Murray (the "Trustee"), Chapter 7 Trustee for the Bankruptcy Estate ("Estate") of Alexander E. Jones ("Alex Jones" or the "Debtor"), by and through his undersigned counsel, respectfully alleges as follows:

## NATURE OF ACTION

1. The Trustee files this adversary complaint (the "Complaint") to avoid and recover a series of textbook fraudulent transfers from the Debtor to his wife, Erika Wulff Jones ("Mrs. Jones"), his father, David R. Jones ("Dr. Jones"), and a trust that the Debtor contends is

unreachable by his creditors, the Alexander E. Jones Descendant and Beneficiary Trust (the "Trust"). As to Mrs. Jones and Dr. Jones, the Trustees also assert preference claims in the alternative to their fraudulent transfer claims with respect to certain transfers.

2. The Debtor owes more than $1 billion to his creditors. The overwhelming majority of the Debtor's liabilities arise out of his campaign of defamation and lies about the families of those killed during a tragic school shooting at Sandy Hook Elementary School in Newtown, Connecticut and other victims of the Debtor's defamation. Much of the Debtor's liabilities have since been found to arise from willful and malicious conduct and, therefore, to be nondischargeable under section 523 of the Bankruptcy Code. Facing this crushing liability, the Debtor caused four of his entities to file for bankruptcy in April and July 2022[1] before this Court and ultimately filed for personal bankruptcy on December 2, 2022, in this Bankruptcy Case.[2]

3. Before filing his personal Bankruptcy Case, the Debtor engaged in an intentional and planned asset protection scheme to transfer cash, cars, and real estate to insiders, including his wife and father, in order to shield those assets from his creditors. In the four years before the Petition Date, the Debtor transferred: (i) approximately $1.5 million in cash to his wife; (ii) three luxury vehicles, a ranch, and more than $500,000 in cash to his father; and (iii) valuable real estate to the Trust at a time when he was insolvent. In virtually none of these instances did the Debtor receive anything in exchange, much less reasonably equivalent value.

4. Many of the transfers the Trustee seeks to avoid and recover in this Complaint occurred during a flurry of activity in the months leading up to the Debtor's personal bankruptcy

[1] *In re InfoW LLC*, Case No. 22-60020-CML (Bankr. S.D.T.X. April 17, 2022); *In re IWHealth, LLC*, Case No. 22-60021-CML (Bankr. S.D.T.X. April 18, 2022); *In re Prison Planet TV, LLC*, Case No. 22-60022-CML (Bankr. S.D.T.X. April 18, 2022); *In re Free Speech Systems LLC*, Case No. 22-60043-CML (Bankr. S.D.T.X. July 29, 2022).

[2] *In re Alexander E. Jones,* Case No. 22-33553 (Bankr. S.D.T.X. December 2, 2022)(the "Bankruptcy Case").

filing. The Debtor filed this personal Bankruptcy Case only a few weeks after the Connecticut Families were awarded nearly $1.5 billion in judgments against him.

5. The Debtor transferred, and his wife and his father received transfers of, millions of dollars in cash and property in a manner bearing the classic hallmarks of transfers made with actual fraudulent intent or at a time when the Debtor was deeply insolvent. Alternatively, many of these transfers could be avoided as preferential payments to insiders. For example:

(a) Just months before the Petition Date (and after his businesses had already filed for bankruptcy), the Debtor and his wife belatedly signed a "ratification" purporting to obligate the Debtor to make payments to Mrs. Jones under a premarital agreement. This eleventh-hour ratification resulted in the transfer of more than $800,000 in cash to Mrs. Jones shortly before the Petition Date. These payments to Mrs. Jones were labeled as either "true-up" payments or "pre-payments" under the purported premarital agreement. The Debtor's attempt to incur an obligation to make payments to his current wife—at a time when he was insolvent and preparing to file for bankruptcy—is avoidable as are all the cash transfers supposedly made in reliance on this invalid debt. Even ***if*** the Debtor had a valid obligation to make payments to his wife under his premarital agreement (which he did not), the transfers made within one year before the Petition Date would still be avoidable as preferential transfers.

(b) The document purporting to transfer the Debtor's real property to his father was back-dated, ostensibly to misrepresent the date of the transfer and to make it appear as if the property had been conveyed outside the typical four-year lookback period for fraudulent transfers.

(c) The Debtor's truly last-minute transfer of three luxury vehicles to his father was so disorganized and harried that the Debtor did not even know which luxury cars he had conveyed to his father until more than a year into his Bankruptcy Case after being confronted with the records. This mad dash to transfer property out of his name to statutory insiders in such close proximity to the Petition Date is indicative of the Debtor's actual intent to hinder, delay, and defraud his creditors when he transferred that property.

(d) The Debtor and/or his father may contend that the half million dollars of cash payments made to Dr. Jones were "reimbursements" for expenses. The receipts produced by them show that only a handful of those cash payments may have been for expense reimbursements (for private jet expenses for the Debtor that were arranged and financed by his father). But, for the vast majority of those cash payments, there is virtually no evidence that they were made to reimburse

the Debtor's father for expenses incurred on the Debtor's behalf. These cash payments are avoidable either as fraudulent transfers or as preferential transfers.

6. As such, the Trustee files this Complaint to avoid and recover transferred property (as described herein) from statutory insiders and a family trust so that those assets may be properly administered for the benefit of the Estate and its creditors as intended under the Bankruptcy Code.

**JURISDICTION AND VENUE**

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334(b) and the Standing Order of the United States District Court for the Southern District of Texas (the "Southern District of Texas") referring to the Bankruptcy Judges of the Southern District of Texas all cases and proceedings arising under title 11 of the Bankruptcy Code.

8. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (E), (F), (H) and (O).

9. The Trustee consents to the entry of final orders or judgments pursuant to Fed. R. Bankr. P. 7008. Pursuant to Bankruptcy Local Rule 7008-1, the Trustee further consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10. Venue in the Southern District of Texas is and was proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with a case commenced under the Bankruptcy Code.

## PARTIES

### A. Plaintiff

11. Plaintiff, Christopher R. Murray is the duly appointed the chapter 7 trustee ("Trustee") for the bankruptcy estate of Alexander E. Jones ("Estate") in the above-referenced bankruptcy case ("Bankruptcy Case") of Alexander E. Jones ("Debtor"). He can be served through counsel of record in this adversary proceeding.

### B. Defendants

12. Defendant Erika Wulff Jones ("Mrs. Jones") is a resident of Austin, Texas. Mrs. Jones has been married to the Debtor since January 6, 2017. Mrs. Jones is the transferee or ultimate recipient of the fraudulent and preferential transfers set out on **Exhibit A** to this Complaint. Mrs. Jones may be served at her residence in Austin, Texas, or wherever she may be found.

13. Defendant Dr. David Ross Jones ("Dr. Jones") is a resident of Austin, Texas. Dr. Jones is the Debtor's father. Dr. Jones is deeply embedded in the Debtor's financial and business affairs. He is the manager of numerous entities in which the Debtor has an interest or that are affiliates of the Debtor or businesses owned by the Debtor. Dr. Jones is the trustee of several asset protection trusts formed by the Debtor to shield non-exempt assets from his creditors. Dr. Jones is the transferee or ultimate recipient of the fraudulent and preferential transfers set out on **Exhibit B** to this Complaint. Dr. Jones can be served at his residence in Austin, Texas, or wherever he may be found.

14. The Trust is a trust that was created by the Debtor under Texas law. The Debtor is the grantor of the Trust. Dr. Jones is the trustee of the Trust. The Debtor claims that he "initially set up" the Trust, but claims that he "presently has no interests" in the Trust and therefore it is not

among his assets.[3] The Trust owns two condominium units on Clawson Road: Unit 3 and Unit 6.[4] This Complaint seeks to avoid the transfer of Unit 6 to the Trust.[5] The Trust can be served through its trustee, Dr. Jones, at his residence in Austin, Texas or wherever he may be found.

## FACTS

### A. Pre-Petition Events Leading to Bankruptcy

15. On December 14, 2012, a mass shooting occurred at Sandy Hook Elementary School, resulting in the deaths of twenty first-grade children and six adults. The Debtor and his wholly owned companies began a willful and malicious campaign of defamation and lies against the families of those victims. Subsequently, after another school shooting at Marjory Stoneman Douglas High School in Parkland, Florida in 2018, the Debtor falsely accused Marcel Fontaine of being the shooter.

16. The targets of the Debtor's defamation commenced lawsuits against the Debtor and certain of his companies, including Free Speech Systems, LLC ("FSS"). The first such of actions was filed on April 2, 2018, and subsequent actions followed shortly thereafter. Due to the Debtor's misconduct in those proceedings, including his noncompliance with discovery, default judgments

---

[3] *See Debtor's Amended Disclosure Statement with Respect to Debtor's Plan of Reorganization* [Dkt. No. 589, pg. 6].

[4] The Debtor wrongfully contends that the Trust owns a third unit on Clawson Road as well (Unit 5). As set forth in *Trustee's Complaint for Turnover and Accounting* filed contemporaneously herewith in a separate proceeding, the Trust does not own Unit 5.

[5] The Trustee reserves the right to challenge the Trust as improper and set aside the Trust in its entirety. This Complaint seeks only to recover the transfer of Unit 6 to the Trust, any payments for the benefit of Unit 3, and any payment for the benefit of Unit 6 to the extent the transfer of the unit is not avoided. The Trustee expressly reserves the right to assert any other claims in respect of the Trust in the future.

on liability were entered in the Texas Litigation[6] in September 2021 and in the Connecticut Litigation[7] in November 2021.

17. Two of the plaintiffs in the Texas Litigation, Neil Heslin and Scarlett Lewis, proceeded to a damages trial. In August 2022, the jury awarded Heslin and Lewis more than $4 million in compensatory damages and approximately $45 million in exemplary damages. The remaining plaintiffs, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine, had not yet proceeded to the damages trial at the time their litigation was stayed by the Debtor's various bankruptcy filings.

18. The Connecticut Litigation also proceeded to trial on the question of damages. In November 2022, the Connecticut Plaintiffs were awarded $965 million in compensatory damages and more than $470 million in additional common law and statutory punitive damages, for a total award of $1,438,139,555.94. The Connecticut Litigation has advanced since the Petition Date: *Lafferty v. Jones*, 327 A.3d 941, 981 (Conn. App. Ct. 2024) (affirming $965 million in compensatory damages in favor of Connecticut plaintiffs); *Lafferty v. Jones*, PSC-240253, Order on Petition for Certification to Appeal (Conn. Apr. 8, 2025) (denying the Debtor's and FSS's petition to appeal the Connecticut judgment to the Connecticut Supreme Court); *Lafferty v. Jones*, AC46131, Order on Motion to Stay (Conn. App. Ct. May 13, 2025) (denying stay of enforcement of Connecticut judgment pending the Debtor's petition for writ of certiorari to the United States Supreme Court).

---

[6] *Heslin v. Jones*, Cause No. D-1-GN-18-001835 in the 261st District Court of Travis County, Texas; *Lewis v. Jones*, Cause No. D-1-GN-18-006623 in the 98th District Court of Travis County, Texas; *De la Rosa* and *Pozner v. Jones*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *Fontaine v. Jones*, Cause No. D-1-GN-18-001605 in the 459th District Court of Travis County, Texas (collectively, the "Texas Litigation")

[7] *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; *Sherlach v. Jones*, X06-UWY-CV-18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and *Sherlach v. Jones*, X06-UWY-CV-18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court (collectively, the "Connecticut Litigation").

19. As a result of these liabilities, the Debtor began placing his companies, which were co-defendants in the litigation, into bankruptcy in Spring 2022. Between April 17 and 18, 2022, the Debtor caused InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC to file for chapter 11 bankruptcy protection before this Court.[8] Then on July 29, 2022, the Debtor caused FSS to file for chapter 11 bankruptcy protection before this Court as well.[9]

20. Finally, on December 2, 2022, the Debtor filed for personal bankruptcy protection under chapter 11 of the Bankruptcy Code (the "<u>Petition Date</u>") before this Court in this Bankruptcy Case.

21. The Debtor continued managing his assets as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code until the Court entered its *Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket No. 708] on June 14, 2024 (the "<u>Conversion Date</u>"). On the Conversion Date, the U.S. Trustee appointed Christopher R. Murray as the Chapter 7 Trustee in the Jones Chapter 7 Case.

22. On June 21, 2024, the Court entered an order dismissing the FSS Case [Case No. 22-60043, Docket No. 956], while retaining exclusive jurisdiction over several adversary proceedings and the approval of professional fees and expenses.

**B. Avoidable Transfers to Erica Wulff Jones**

23. The Debtor made approximately $1.5 million in avoidable cash transfers to his current wife, Mrs. Jones. A significant portion of the cash transfers—$833,943—were made in the months leading up to the Petition Date in a clear attempt to siphon as much value as possible into his wife's accounts and away from his creditors. Only 7 months before the Petition Date, the

---

[8] *In re InfoW LLC*, Case No. 22-60020-CML (Bankr. S.D. Tex. April 17, 2022); *In re IWHealth, LLC*, Case No. 22-60021-CML (Bankr. S.D. Tex. April 18, 2022); *In re Prison Planet TV, LLC*, Case No. 22-60022-CML (Bankr. S.D. Tex. April 18, 2022).

[9] *In re Free Speech Systems LLC*, Case No. 22-60043-CML (Bankr. S.D.T.X. July 29, 2022).

Debtor signed a document purporting to bind himself to make payments to Mrs. Jones pursuant to a premarital agreement. This purported payment obligation is under the premarital agreement is also an avoidable transfer.

***(1) The Fraudulent Obligation to Mrs. Jones***

24. The Debtor and Mrs. Jones were married on January 6, 2017. Before they were married, the Debtor and Mrs. Jones entered into a premarital agreement dated December 2016 (the "Premarital Agreement"). Among various terms, the Premarital Agreement has a section that purports to require the Debtor to make certain payments to his wife during the course of their marriage, but *only if* the parties *execute a ratification after* their marriage.

25. Section 14 of the Premarital Agreement provides the following condition precedent for all obligations set forth in Section 14, which includes cash payments to Mrs. Jones:

> Notwithstanding any other provision herein to the contrary, the parties agree that *the provisions in the Article 14 take precedence* over other provisions, if any are contrary to that which is set forth in this Article. *All obligations herein established for Alex to make payments to, or provide assets to, Erika are subject to and conditioned upon Erika's execution of a postmarital ratification and reaffirmation of this Agreement*, specifically to include an essentially identical partition and exchange of assets, plus essentially identical substantive provisions as herein contained, and further to include specific ERISA waivers (and related partitions and/or exchanges) that only spouses are permitted to execute.

(emphasis added).

26. Subject entirely to the above-noted ratification requirement, Section 14 of the Premarital Agreement would require, among other things, that the Debtor provide Mrs. Jones with monthly payments during their marriage. The Premarital Agreement states:

> Payments During Marriage. *Providing the parties have executed the Ratification of Agreement in Contemplation of Marriage, which is a specific condition precedent to the following payment obligation(s),* starting on the first day of the month following the month during

> which the parties were married and continuing on the same day of each successive calendar month during which the parties are married to each. other, Alex shall pay to Erika the non-taxable sum of $12,000, together with a 4% increase, compounded annually, each full year the parties are married.

(emphasis added).

27. With respect to the Ratification, the Premarital Agreement at Section 15.12 provides that:

> *Within thirty (30) days after* the Parties' Marriage, each Party will execute a Ratification of Premarital Agreement ('Ratification Agreement') that will be substantially similar in form and content to the Ratification Agreement attached as Exhibit 3 and incorporated by reference.

(emphasis added).

28. The Debtor and Mrs. Jones did not sign the ratification within thirty days after their marriage as required by the Premarital Agreement.

29. The Debtor and Mrs. Jones waited until more than *five years* after their marriage to suddenly (and very belatedly) sign the ratification on May 3, 2022. It is telling that they signed the ratification *after* the default judgments were entered against the Debtor in both the Texas Litigation and Connecticut Litigation—and just one month after the Debtor placed his first three entities into bankruptcy and the Texas Plaintiffs commenced a fraudulent transfer action against the Debtor and his companies in Texas state court.[10] The timing reveals that the Debtor and Mrs. Jones likely realized that the Debtor was under no obligation to make any payments to Mrs. Jones under Section 14 of the Premarital Agreement because it was never ratified and that creditors would soon be coming to collect their judgments against the Debtor. As such, they very belatedly signed the

[10] *See Heslin v. Jones*, Cause No. D-1-GN-22-001610 in the 200th District Court of Travis County, Texas.

ratification in an attempt to incur an obligation for the Debtor to pay Mrs. Jones and to hinder, delay, and defraud the Debtor's creditors.

30. Mrs. Jones provided no consideration to the Debtor in exchange for his belated signing of the ratification in May 2022.

***(2) The Fraudulent Cash Transfers to Mrs. Jones***

31. Over the four years prior to the Petition Date, the Debtor transferred approximately $1.5 million in cash to Mrs. Jones, as set forth on **Exhibit A**.

32. The majority of the $1.5 million in cash transfers to Mrs. Jones were made shortly before the Debtor filed his personal Bankruptcy Case. This was clearly done to siphon as much cash as possible to Mrs. Jones before the Debtor filed for bankruptcy protection. The Debtor was worried that creditors would soon start to collect their judgments and seize his funds, leaving nothing to pay the allowance to Mrs. Jones.

33. Less than two months before the Petition Date, the Debtor transferred $229,764 to Mrs. Jones as a supposed "prepayment" of her monthly allowance. There is no doubt this large cash transfer was made to Mrs. Jones ahead of the Debtor's bankruptcy filing in cash his access to cash and/or ability to pay her monthly allowance was restricted.

34. Only 24 days before the Petition Date—on November 8, 2022—the Debtor transferred $78,140 in purported "true-up" payments to Mrs. Jones. The Debtor and Mrs. Jones contend these so-called "true-up" payments were due to Mrs. Jones because the Debtor had not previously paid her "interest" on monthly payments. On November 3, 2022, the Debtor sent a text message to Mrs. Jones that he was "trying to pay you back money" and instructed her to send him "the amount in the last 5 years you have been under payed [sic]." Approximately half an hour later,

Mrs. Jones sent the Debtor an email asserting she was owed "$78,140" in "back pay." The payment of $78,140 was made to Mrs. Jones five days later.

35. Mrs. Jones provided no consideration for any of the cash transfers set forth on **Exhibit A**.

36. As noted, the Debtor had no obligation to make any payments to Mrs. Jones because they did not properly or timely execute a ratification of the Premarital Agreement. Moreover, many of the cash transfers identified on **Exhibit A** were for amounts in excess of the amount stated in the un-ratified Premarital Agreement. Indeed, in the one year prior to the Petition Date, the Debtor transferred at least $833,943 in cash to Mrs. Jones, a sum more than four times greater than the approximately $175,000 to which Mrs. Jones would have been entitled to receive if the Premarital Agreement was valid (which it was not).

**C. Transfer of Real Property to Dr. Jones with a Back-Dated Deed**

37. On April 27, 2022, the Debtor and/or Dr. Jones filed a general warranty deed for recording with the Blanco County Clerk. The general warranty deed (the "Pedernales Deed") purports to transfer tract 18 of Pedernales Hills Ranches (the "Pedernales Ranch") in Blanco County, Texas from the Debtor to Dr. Jones. The document indicates that the Pedernales Ranch was transferred for *de minimis* consideration of $10.

38. The Pedernales Deed was signed by the Debtor as the "grantor" and his mother and sister as witnesses. The Pedernales Deed was ***back dated*** in order to state (incorrectly) that the land had been transferred and the deed had been signed April 3, 2017.

39. Specifically, the signature line of the Pedernales Deed appears as follows:



**IN WITNESS WHEREOF, Grantor has executed and delivered this General Warranty Deed as of the day and year first below written.**

EXECUTED ~~this day of~~ April 3rd, 2017

Grantor's Signature

Alexander E Jones

Grantor's Name

15101 Back of the Moon D

Address

Austin Texas 78734

City, State & Zip

**In Witness Whereof,**

Witness's Signature

Carol A Jones

Witness's Name

3402 Clawson Rd

Address

Austin Texas 78704

City, State & Zip

Witness's Signature

Marleigh R Jones

Witness's Name

3402 Clawson Rd

Address

Austin, Texas 78704

City, State & Zip

40. The Pedernales Deed was notarized on April 14, 2022—nearly 5 years after its alleged execution. Patrick Riley, an associate of the Debtor, notarized the Pedernales Deed. Riley signed his name to certify that "Marleigh Jones, Carol Jones, David R Jones and Alexander E Jones, whose names are signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of the instrument, they, executed the same voluntarily on the day the same bears the date." The strange formulation of the notary paragraph further underscores the attempt to state, incorrectly, that the Pedernales Deed had

been signed in 2017 (which it was not). Indeed, the assertion that the Pedernales Deed was created and signed in 2017 is demonstrably false.

41. *First*, Riley, the notary, testified under oath that the Pedernales Deed had been signed in front of him in 2022.

42. *Second*, Dr. Jones testified under oath that he caused the Pedernales Deed to be created in 2022.

43. *Third*, the Debtor filed taxes in which he took itemized deductions for the "PEDERNALES HILLS RANCH" in tax years 2018, 2019 and 2020. The public website notes that Mr. Jones was the 100% owner of Pedernales Ranch until 2022.

44. *Fourth*, Dr. Jones created a document in August 2017 (i.e., six months after the purported date of the deed) entitled "AJ financial condition and fiduciary" and lists the Debtor's assets. The document includes the Pedernales Ranch among the Debtor's "other assets" as a fee simple property.

45. *Fifth*, the Pedernales Ranch could not have been lawfully transferred in April 2017 because it was subject to a lien held by the Debtor's ex-wife. Specifically, on March 23, 2015, a final decree of divorce was entered between Mr. Jones and his ex-wife. Pursuant to the divorce decree, Mr. Jones received, as his sole and separate property, the Pedernales Ranch. The Debtor also executed a Real Estate Lien Note (the "Note"), with an original principal amount of $2,727,951, in favor of his ex-wife and secured by two deeds of trust, one of which was on the Pedernales Ranch (the "Pedernales Ranch Deed of Trust"). The Pedernales Ranch Deed of Trust provides, among other things, that the Debtor:

> [C]onveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property, subject to the other exceptions to conveyance and warranty. On payment of the note and all other amounts secured by this deed of trust, this deed of trust will

> have no further effect, and [ex-wife] will release it at [the Debtor's] expense.

46. The Debtor filed suit against his ex-wife on September 8, 2021, alleging, among other things, that he had repaid the Note on March 3, 2021, and seeking, among other things, to have the Pedernales Ranch Deed of Trust released. Summary judgment in favor of the Debtor was entered on December 3, 2021, which, among other things, released the Pedernales Ranch Deed of Trust.

47. The Debtor then signed and recorded the back-dated deed to transfer the Pedernales Ranch to his father in April 2022. He did this after the default judgments had been entered against him in the Texas and Connecticut Litigation, in the same month that he placed his first three entities into bankruptcy, and just two weeks before he signed the ratification for the purported Premarital Agreement. The Debtor back-dated the Pedernales Deed to make it look, incorrectly, as if the property had been transferred to his father in April 2017—a date that is conveniently just before the typical four-year statute of limitations for a fraudulent transfer under Texas law. The Debtor was deeply insolvent as of April 2022.

48. The evidence is overwhelming that the Debtor conveyed the Pedernales Ranch to his father in April 2022 with the intent of keeping the asset "in the family" and shielding it from his creditors. The Pedernales Ranch was assessed by the appraisal district at $137,270 in 2022, at $249,870 in 2023 and 2024, and at $306,860 in 2025.

### D. Vehicles Fraudulently Transferred to Dr. Jones Weeks Before the Petition Date

49. On October 12, 2022, the Debtor transferred title for three vehicles to Dr. Jones: (i) a 2012 Ford F-150 Raptor; (ii) a 2015 Dodge Challenger; and (iii) a 2019 Toyota 4Runner.

50. Dr. Jones paid no consideration for the three vehicles.

51. The Debtor conveyed these three vehicles to Dr. Jones just a month and a half before the Petition Date, around the same time that the Debtor was engaged in a flurry of activity to attempt to shield assets from creditors, as described herein.

52. The transfer of the three vehicles to Dr. Jones was so rushed and chaotic, that the Debtor did not even know which cars he had given to his father. In his schedules and statements, the Debtor mistakenly disclosed that he had transferred two Ford Raptors and a Dodge Challenger to Dr. Jones in October 2022.[11]

53. As of the time of transfer to Dr. Jones, the Debtor valued the Dodge Challenger at $42,347 and the 2012 Ford Raptor at $35,095. The value of the 2019 4Runner at the time of transfer is unknown.

**E. Fraudulent Cash Transfers to Dr. Jones**

54. In the year before the Petition Date, the Debtor began a new practice of making cash transfers to his father, Dr. Jones. The Debtor had not previously transferred cash to his father in this way.

55. The Debtor transferred a total of $553,388.76 in cash to Dr. Jones, as set forth on the attached **Exhibit B**.

56. The Debtor and his father contend that the payments were made to "reimburse" Dr. Jones for expenses he had previously incurred on the Debtor's behalf. Dr. Jones provided documentation showing that only a small portion of such payments were in fact expense reimbursements, as detailed in **Exhibit B**.

---

[11] *See* Third Amended Statement of Financial Affairs [Dkt. No. 502, pg. 27 of 31].

57. The Debtor's payments to Dr. Jones were not made in the ordinary course. The Debtor had no previous course of conduct with Dr. Jones to advance his expenses or to reimburse him for any such advances.

58. The Debtor and Dr. Jones were well-aware of the Debtor's significant liabilities when he received these cash transfers. The $553,388.76 in cash payments made by the Debtor to Dr. Jones were part and parcel of an overall effort to transfer the Debtor's valuable assets out of the reach of creditors. The Debtor transferred these cash payments with actual intent to hinder, delay and defraud his creditors.

**F. Fraudulent Transfer of Condominium to Trust**

59. Prior to February 2019, a condominium known as "Unit 6" located at 3504 Clawson Road, Austin, TX 78704 ("Clawson Road") was owned by the RXXCTTGAA Trust. The RXXCTTGAA Trust was a revocable trust of which the Debtor was both the grantor and the beneficiary. Non-exempt assets in the RXXCTTGAA Trust could be reached by creditors and its assets were part of the Debtor's estate.

60. On February 20, 2019, the RXXCTTGAA Trust transferred Unit 6 to the Trust, The Debtor contends that the assets of the Trust are not reachable by his creditors and are not part of his estate.

61. The Trust gave no consideration in exchange for the RXXCTTGAA Trust transferring Unit 6 to it in February 2019. The Debtor valued Unit 6 at $828,300 in his schedules.[12]

62. At the time Unit 6 was transferred to the Trust, the Debtor had already been named in the Connecticut and Texas Litigation and was insolvent.

[12] *See* Conversion Schedules [Dkt. No. 749, pg. 11 of 54].

63. In addition to transferring Unit 6, the Debtor incurred upkeep expenses and paid taxes on behalf of the condominiums on Clawson Road, including Units 3 and 6.

64. The Debtor acknowledges that he spent at least $16,000 on property taxes for the benefit of Unit 3 and at least $14,000 on property taxes for the benefit of Unit 6 in the year prior to the Petition Date. But the Debtor has spent significant additional unknown sums on maintenance, cleaning, taxes and other expenses associated with the condominiums. In addition, records show that the Debtor spent more than $800,000 on home improvements, taxes, utilities, insurance, and HOA fees for a combination of properties that includes, Unit 3 and Unit 6. It is unknown how much of the $800,000 was spent on Unit and Unit 6 versus other properties of the Debtor.

## CAUSES OF ACTION

### Count 1
### Avoidance of Incurrence of Fraudulent Obligation to Mrs. Jones under the Premarital Agreement
### (11 U.S.C. §§ 544(b), 548, 550(a)(1) and TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.005(a)(2), and 24.006)

65. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

66. The Debtor had no obligation to make any payments to Mrs. Jones under his purported Premarital Agreement unless he and Mrs. Jones signed a ratification within thirty days after their marriage. They did not do so.

67. The Debtor and Mrs. Jones signed a ratification for the Premarital Agreement on May 3, 2022, at a time when default judgments had been entered against the Debtor, the Debtor had already put three of his entities into bankruptcy, and the Debtor and his family were engaged in a flurry of fraudulent transactions all designed to transfer assets out of the reach of his creditors.

68. The Debtor was insolvent at the time that he signed the ratification due to the massive liability arising out of the Texas Litigation and the Connecticut Litigation.

69. The Debtor received no consideration in exchange for the belated ratification and incurring the purported obligations under Section 14 of the Premarital Agreement.

70. The Debtor signed the ratification and attempted to incur the purported obligations under Section 14 of the Premarital Agreement with the intent to hinder, delay, and defraud his creditors.

71. Under section 548(a)(1)(A) of the Bankruptcy Code, the Debtor may avoid any obligation incurred by the Debtor that was incurred with actual intent to hinder, delay, or defraud the Debtor and his creditors.

72. Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtor may avoid any obligation incurred by the Debtor at a time when the Debtor was insolvent and for which the Debtor received less than reasonably equivalent value.

73. Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any obligation incurred by the Debtor that is voidable under other applicable law by a creditor holding an unsecured, allowable claim. One or more creditors of the Debtor hold allowed or allowable claims under other applicable law and, therefore, the Trustee can avoid the obligations incurred in connection with the Premarital Agreement as fraudulent under applicable law, including but not limited to the Texas Uniform Fraudulent Transfers Act ("TUFTA"). Under TUFTA, the Debtor may avoid any obligation incurred, by the Debtor with the actual intent to hinder, delay, or defraud creditors of the Debtor and any constructive fraudulent transfer. TUFTA §§ 24.005(a)(1); 24.005(a)(2); 24.006.

74. The Debtor's purported incurrence of an obligation to Mrs. Jones to make any payments under Section 14 of the Premarital Agreement was actually and constructively fraudulent and should be avoided *ab initio.*

75. The Trustee respectfully requests entry of a judgment avoiding the fraudulent obligation incurred by the Debtor to Mrs. Jones under Section 14 of the Premarital Agreement. The Trustee is also entitled to recovery of costs and attorney's fees under TUFTA.

**Count 2**
**Avoidance of Fraudulent Cash Transfers to Mrs. Jones**
**(11 U.S.C. §§ 544(b), 548, 550(a)(1), and TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.005(a)(2), and 24.006)**

76. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

77. The Debtor made each of the cash transfers to Mrs. Jones in the amounts and on the dates set forth in **Exhibit A**.

78. The Debtor was insolvent when he made each of the transfers on **Exhibit A**.

79. The Debtor received no consideration for the transfers set forth in **Exhibit A**.

80. The Debtor had no obligation to make any of the payments to Mrs. Jones as set forth on **Exhibit A**. Even if he did have an obligation (which he did not) the amounts transferred to Mrs. Jones greatly exceeded the $12,000 per month, plus interest, contemplated by Section 14 of the Premarital Agreement.

81. The Debtor made the cash transfers set forth on the attached **Exhibit A** to Mrs. Jones with the intent to hinder, delay, and defraud his creditors. The Debtor's intent is evident from the transfer of approximately $800,000 shortly before filing his personal bankruptcy case, while he was placing his companies into bankruptcy, and at a time when the Debtor and his family

were engaged in a flurry of fraudulent transactions all designed to transfer assets out of the reach of his creditors.

82. Under section 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest in property by the Debtor that was made with actual intent to hinder, delay, or defraud the Debtor and his creditors. The cash transfers to Mrs. Jones set forth on **Exhibit A** are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

83. Under section 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest in property by the Debtor at a time when the Debtor was insolvent and for which the Debtor received less than reasonably equivalent value. The cash transfers to Mrs. Jones set forth on **Exhibit A** are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

84. Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property that is voidable under other applicable law by a creditor holding an unsecured, allowable claim. One or more creditors of the Debtor hold allowed or allowable claims under other applicable law and, therefore, can avoid the transfers under applicable law, including but not limited to TUFTA. Under TUFTA, the Debtor may avoid any transfer made by the Debtor with the actual intent to hinder, delay, or defraud creditors of the Debtor and any constructive fraudulent transfer. TUFTA §§ 24.005(a)(1); 24.005(a)(2); 24.006. The cash transfers to Mrs. Jones set forth on **Exhibit A** are avoidable under section 544(b)(1) of the Bankruptcy Code and TUFTA.

85. The Trustee may recover from Mrs. Jones the avoidable cash transfers set forth on **Exhibit A** for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

86. The cash transfers made by the Debtor to Mrs. Jones and set forth on **Exhibit A** should be avoided as actual and constructive fraudulent transfers under sections 548(a)(1)(A) and

(B) of the Bankruptcy Code, section 544(b)(1) of the Bankruptcy Code, and TUFTA §§ 24.005(a)(1) and (2) and 24.006, and the value of the transfers recovered under section 550 of the Bankruptcy Code. The Trustee is also entitled to recovery of costs and attorney's fees under TUFTA.

**Count 3**
**In the Alternative, Avoidance of Preferential Transfers Against Mrs. Jones**
**(11 U.S.C. §§ 547(b) and 550(a)(1))**

87. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

88. The Debtor alleges that he was required to make payments to Mrs. Jones under their Premarital Agreement. This is incorrect for all the reasons set forth in this Complaint.

89. During the one year immediately preceding the Petition Date, the Debtor made payments totaling $833,943 to Mrs. Jones as set forth in **Exhibit A** (the "Mrs. Jones Preference Transfers"). The date and amount of each Mrs. Jones Preference Transfer is set forth in **Exhibit A**. The Trustee reserves the right to assert that any payment set forth on **Exhibit B** constitutes a preference.

90. To the extent that Mrs. Jones and the Debtor contend that the Premarital Agreement required payments to Mrs. Jones, Mrs. Jones was purportedly a creditor of the Debtor.

91. Mrs. Jones has been an insider of the Debtor since their marriage on January 6, 2017.

92. To the extent that Mrs. Jones and the Debtor contend that the Premarital Agreement required payments to Mrs. Jones, the Mrs. Jones Preference Transfers would have been made on account of an antecedent debt owed by the Debtor.

93. The Debtor was insolvent on the dates the Mrs. Jones Preference Transfers were made.

94. The Mrs. Jones Preference Transfers enabled Mrs. Jones to receive more than she would have received if: (a) this case was a case under chapter 7 of the Bankruptcy Code, (b) the transfers had not been made, and (c) Mrs. Jones received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

95. Mrs. Jones has not repaid the Mrs. Jones Preference Transfer in connection with the Premarital Agreement to the Estate.

96. Based on the foregoing reasons, the Mrs. Jones Preference Transfer identified on **Exhibit A** constitute avoidable preferences within the meaning of section 547(b) of the Bankruptcy Code.

97. The Trustee may recover from Mrs. Jones the Mrs. Jones Preference Transfers as set forth on **Exhibit A** for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

98. The Mrs. Jones Preference Transfers set forth as preferences on **Exhibit A** should be avoided under section 547(b) of the Bankruptcy Code and the value of such transfers recovered under section 550 of the Bankruptcy Code.

## Count 4
## Avoidance of Fraudulent Transfers of Cash, Vehicles, and the Pedernales Ranch to Dr. Jones
## (11 U.S.C. §§ 544(b), 548, 550(a)(1), and TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.005(a)(2), and 24.006)

99. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

100. The Debtor made each of the cash transfers to Dr. Jones on the dates and in the amounts set forth in **Exhibit B**. The Debtor received little or no consideration in exchange for transferring this cash to Dr. Jones.

101. The Debtor transferred the Pedernales Ranch to Dr. Jones on April 27, 2022, when the Pedernales Deed was filed with Brazos County. The Debtor received *de minimis* consideration of $10 from Dr. Jones for the transfer of the Pedernales Ranch

102. The Debtor transferred a 2012 Ford F-150 Raptor, a 2015 Dodge Challenger and a 2019 Toyota 4Runner to Dr. Jones on October 12, 2022. Dr. Jones gave the Debtor no consideration for these three vehicles.

103. The Debtor was insolvent when he transferred to Dr. Jones the cash transfers set forth on **Exhibit B**, the three vehicles, and the Pedernales Ranch.

104. The Debtor transferred the cash set forth on **Exhibit B**, the three vehicles, and the Pedernales Ranch, with the intent to hinder, delay, and defraud his creditors. The Debtor's fraudulent intent is evident from the fact that the Pedernales Deed was back-dated to try to avoid the lookback period, the vehicles were transferred only weeks before the Debtor's personal bankruptcy filing, and the Debtor and his father shifted their practices to result in significant cash payments to Dr. Jones in the year before the Petition Date. All of these transfers occurred during a time when the Debtor engaged in a flurry of fraudulent transactions all designed to transfer assets out of the reach of his creditors and at a time when the Debtor was insolvent.

105. Under section 548(a)(1)(A) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor that was made with actual intent to hinder, delay, or defraud the Debtor and his creditors. The cash transfers to Dr. Jones set forth on **Exhibit B** are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

106. Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor at a time when the Debtor was insolvent and for which the Debtor received less than reasonably equivalent value. The cash transfers to Dr. Jones set forth on **Exhibit B** are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

107. Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property that is voidable under other applicable law by a creditor holding an unsecured, allowable claim. One or more creditors of the Debtor hold allowed or allowable claims under other applicable law and, therefore, can avoid the transfers under applicable law, including but not limited to TUFTA. Under TUFTA, the Debtor may avoid any transfer incurred, by the Debtor with the actual intent to hinder, delay, or defraud creditors of the Debtor and any constructive fraudulent transfer. TUFTA §§ 24.005(a)(1); 24.005(a)(2); 24.006. The cash transfers to Dr. Jones set forth on **Exhibit B** are avoidable under section 544(b)(1) of the Bankruptcy Code and TUFTA.

108. The Trustee may recover from Dr. Jones the value of the cash transfers set forth on **Exhibit B**, the three vehicles (or the value of the three vehicles at the time of transfer), and the Pedernales Ranch for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

109. The transfers made by the Debtor to Dr. Jones and set forth on **Exhibit B** should be avoided as actual and constructive fraudulent transfers under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, section 544(b)(1) of the Bankruptcy Code, and TUFTA §§ 24.005(a)(1) and (2) and 24.006, and the value of the transfers recovered under section 550 of the Bankruptcy Code. The Trustee is also entitled to recovery of costs and attorney's fees under TUFTA.

**Count 5**
**In the Alternative, Avoidance of Preferential Transfers Against Dr. Jones**
**(11 U.S.C. §§ 547(b) and 550(a)(1))**

110. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

111. The Debtor transferred at least $173,148 in cash payments to Dr. Jones in the year prior to the Petition Date to reimburse Dr. Jones for expenses Dr. Jones claims to have incurred on the Debtor's behalf as set forth in **Exhibit B** (the "Dr. Jones Preference Transfers"). The date and amount of each Dr. Jones Preference Transfer is set forth in **Exhibit B**.

112. To the extent any other cash payments to Dr. Jones are shown to have been made to reimburse Dr. Jones for expenses incurred on the Debtor's behalf, such other payments would also constitute avoidable preferences. The Trustee reserves the right to assert that any payment set forth on **Exhibit B** constitutes a preference.

113. At the time of the Dr. Jones Preference Transfers, Dr. Jones was purportedly a creditor of Mr. Jones on account of the expense Dr. Jones had incurred on the Debtor's behalf.

114. At the time of the Dr. Jones Preference Transfers, Dr. Jones was an insider of Mr. Jones.

115. The Dr. Jones Preference Transfers enabled Dr. Jones to receive more than he would have received if: (a) this case was a case under chapter 7 of the Bankruptcy Code, (b) the transfers had not been made, and (c) Dr. Jones received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

116. Dr. Jones has not repaid any of amounts identified on **Exhibit B** to the Estate.

117. Based on the foregoing reasons, the Dr. Jones Preference Transfers made to Dr. Jones in the year prior to the Petition Date would alternatively constitute avoidable preferences within the meaning of section 547(b) of the Bankruptcy Code.

118. The Trustee may recover from Dr. Jones the Dr. Jones Preference Transfers as set forth on **Exhibit B** for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

119. The Dr. Jones Preference Transfers set forth as preferences on **Exhibit B** should be avoided under section 547(b) of the Bankruptcy Code and the value of the transfers recovered under section 550 of the Bankruptcy Code.

**Count 6**
**Avoidance of Transfer of Unit 6 and Transfer of Cash Payments for the Benefit of Unit 3 as Fraudulent Transfers Against Dr. Jones as Trustee for the Trust**
**(11 U.S.C. §§ 544(b), 548, 550(a)(1), and TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.005(a)(2), and 24.006)**

120. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

121. On February 20, 2019, the transfer of Unit 6 from the RXXCTTGAA Trust to the Trust was recorded with the County Clerk of Travis County, Texas.

122. In the four years prior to the Petition Date, the Debtor made extensive payments, including upkeep, cleaning, and taxes, for the benefit of the three condominiums located at 3504 Clawson Road. The Debtor acknowledges that he spent at least $16,000 on property taxes for the benefit of Unit 3 in the year prior to the Petition Date, among other costs. In addition, records show that the Debtor spent more than $800,000 on home improvements, taxes, utilities, insurance, and HOA fees for a combination of properties that includes, but is not limited to, Unit 3. It is presently unclear how much of the approximately $800,000 was spent in respect of Unit 3 and how much was spent in respect of the Debtor's other properties.

123. The Debtor received nothing in exchange for each of the foregoing transfers.

124. The Debtor was insolvent when he made each of the foregoing transfers.

125. The Debtor received *de minimis* consideration of $10 for the transfer of Unit 6 to the Trust.

126. The Debtor made each of the foregoing transfers with the intent to hinder, delay, and defraud his creditors. The Debtor's intent is evident from the fact that Unit 6 was transferred for no consideration from the RXXCTTGAA Trust, a revocable trust the Debtor concedes is reachable by creditors, to the Trust, which the Debtor contends is not reachable by creditors, after the commencement of the Texas Litigation and Connecticut Litigation. Additionally, all cash payments for the benefit of Unit 3 (owned by the Trust) removed the same cash value from the Debtor's estate to the detriment of his creditors. Each of these transfers occurred during a time when the Debtor was engaged in flurry of fraudulent transactions all designed to transfer assets out of the reach of his creditors.

127. Under section 548(a)(1)(A) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor that was made with actual intent to hinder, delay, or defraud the Debtor and his creditors. The transfers of Unit 6 to the Trust and the cash transfers for the benefit of Unit 3 are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

128. Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor at a time when the Debtor was insolvent and for which the Debtor received less than reasonably equivalent value. The transfers of Unit 6 to the Trust and the cash transfers for the benefit of Unit 3 are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

129. Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property that is voidable under other applicable law by a creditor holding an unsecured, allowable claim. One or more creditors of the Debtor hold allowed or allowable claims under other applicable law and, therefore, can avoid the transfers under applicable law, including but not limited to TUFTA. Under TUFTA, the Debtor may avoid any transfer incurred, by the Debtor with the actual intent to hinder, delay, or defraud creditors of the Debtor and any constructive fraudulent transfer. TUFTA §§ 24.005(a)(1); 24.005(a)(2); 24.006. The transfers of Unit 6 to the Trust and the cash transfers for the benefit of Unit 3 are avoidable under section 544(b)(1) of the Bankruptcy Code and TUFTA.

130. The Trustee may recover Unit 6 and the cash transfers for the benefit of Unit 3 from Dr. Jones, as trustee of the Trust, for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

131. The transfers made by the Debtor to Trust should be avoided as actual and constructive fraudulent transfers under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, section 544(b)(1) of the Bankruptcy Code, and TUFTA §§ 24.005(a)(1) and (2), and 24.006, and the value of the transfers recovered under section 550 of the Bankruptcy Code. The Trustee is also entitled to recovery of costs and attorney's fees under TUFTA.

**Count 7**

**In the Alternative, Avoidance of Cash Payments for the Benefit of Unit 6 as Fraudulent Transfers Against Dr. Jones as Trustee for the Trust**
**(11 U.S.C. §§ 544(b), 548, 550(a)(1), and TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.005(a)(2), and 24.006)**

132. The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

133. In the four years prior to the Petition Date, the Debtor made extensive payments, including upkeep, cleaning, and taxes, for the benefit of the three condominiums located at 3504 Clawson Road. The Debtor acknowledges that he spent at least $14,000 on property taxes for the benefit of Unit 6 in the year prior to the Petition Date, among other costs. In addition, records show that the Debtor spent more than $800,000 on home improvements, taxes, utilities, insurance, and HOA fees for a combination of properties that includes, but is not limited to, Unit 6. It is presently unclear how much of the approximately $800,000 was spent in respect of Unit 6 and how much was spent in respect of the Debtor's other properties. The Debtor was insolvent throughout the period when he made these payments.

134. The Debtor received nothing in exchange for these payments.

135. To the extent that the Court does not set aside the transfer of Unit 6 to the Trust, all cash payments made by the Debtor for the benefit of Unit 6 constitute fraudulent transfers, as they were made with the intent to hinder, delay, and defraud his creditors. The Debtor's intent is evident from the fact that all payments for the benefit of Unit 6, to the extent it was lawfully transferred to the Trust, removed the same cash value from the Debtor's estate to the detriment of his creditors. Each of these transfers occurred during a time when the Debtor engaged in a flurry of fraudulent transactions all designed to transfer assets out of the reach of his creditors.

136. Under section 548(a)(1)(A) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor that was made with actual intent to hinder, delay, or defraud the Debtor and his creditors. The cash transfers for the benefit of Unit 6 are avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

137. Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property by the Debtor at a time when the Debtor was insolvent and for

which the Debtor received less than reasonably equivalent value. The cash transfers for the benefit of Unit 6 are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

138. Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest in property that is voidable under other applicable law by a creditor holding an unsecured, allowable claim. One or more creditors of the Debtor hold allowed or allowable claims under other applicable law and, therefore, can avoid the transfers under applicable law, including but not limited to TUFTA. Under TUFTA, the Debtor may avoid any transfer incurred, by the Debtor with the actual intent to hinder, delay, or defraud creditors of the Debtor and any constructive fraudulent transfer. TUFTA §§ 24.005(a)(1); 24.005(a)(2); 24.006 The cash transfers for the benefit of Unit 6 are avoidable under section 544(b)(1) of the Bankruptcy Code.

139. The Trustee may recover the cash transfers for the benefit of Unit 6 from Dr. Jones, as trustee of the Trust, for the benefit of the Estate under section 550(a)(1) of the Bankruptcy Code.

140. The transfers made by the Debtor to the Trust should be avoided as actual and constructive fraudulent transfers under sections 548(a)(1)(A) and (B) of the Bankruptcy Code, section 544(b)(1) of the Bankruptcy Code, and TUFTA §§ 24.005(a)(1) and (2) and 24.006, and the value of the transfers recovered under section 550 of the Bankruptcy Code. The Trustee is also entitled to recovery of costs and attorney's fees under TUFTA.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment and grant the following relief:

a. a judgment avoiding the purported obligations under Section 14 of the Premarital Agreement and declaring that the Debtor has and had no obligation to make payments to Mrs. Jones pursuant to the Premarital Agreement;

b. a judgment avoiding and recovering all cash transfers to Mrs. Jones set forth on **Exhibit A** as actual and/or constructive fraudulent transfers;

c. in the alternative, a judgment avoiding and recovering the Mrs. Jones Preference Transfers, as set forth on **Exhibit A**, as preferential transfers;

d. a judgment avoiding and recovering cash transfers to Dr. Jones set forth on **Exhibit B** as actual and/or constructive fraudulent transfers;

e. a judgment avoiding and recovering the Dr. Jones Preference Transfers to Dr. Jones set forth on **Exhibit B** as preferential transfers;

f. a judgment avoiding and recovering the transfer of the 2012 Ford F-150 Raptor, the 2015 Dodge Challenger, and the 2019 Toyota 4Runner as actual and/or constructive fraudulent transfers;

g. a judgment avoiding and recovering the transfer of the Pedernales Ranch to Dr. Jones as an actual and/or constructive fraudulent transfer;

h. a judgment avoiding and recovering the transfer of Unit 6 and cash transfers for the benefit of Unit 3 to the Trust as actual and/or constructive fraudulent transfers;

i. in the alternative, a judgment avoiding and recovering the cash transfer for the benefit of Unit 6 to the Trust, as actual and/or fraudulent transfers;

j. recovery of any of the foregoing property that was fraudulently transferred, or compensatory damages in an amount to be determined at trial for the value thereof, from Mrs. Jones, Dr. Jones and the Trust;

k. prejudgment interest to the maximum extent allowed under applicable law;

l. reasonable attorneys' fees, costs, and expenses incurred in this action to the maximum extent allowed under applicable law; and

m. any other and further relief as the Court deems just, proper, or equitable under the circumstances.

Dated: June 13, 2025
Houston, Texas

Respectfully submitted,

By: */s/ Erin E. Jones*

Erin E. Jones (TX 24032478)
**JONES MURRAY LLP**
602 Sawyer Street, Suite 400
Houston, Texas 77007
Telephone: (832) 529-1999
Fax: (832) 529-3393
erin@jonesmurray.com

*and*

**PORTER HEDGES LLP**
Joshua W. Wolfshohl (Bar No. 24038592)
Michael B. Dearman (Bar No. 24116270)
Jordan T. Stevens (Bar No. 24106467)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jwolfshohl@porterhedges.com
mdearman@porterhedges.com
jstevens@porterhedges.com

*Counsel for Christopher R. Murray, Chapter 7 Trustee*